# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-00207-COA

| | |
|---|---|
| STANLEY R. CHESNEY A/K/A STANLEY RAY CHESNEY A/K/A STANLEY CHESNEY | APPELLANT |
| v. | |
| STATE OF MISSISSIPPI | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 09/20/2012 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BRAD ALAN SMITH |
| DISTRICT ATTORNEY: | MARK SHELDON DUNCAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF FIVE COUNTS OF EXPLOITATION OF A CHILD AND SENTENCED TO THIRTY YEARS FOR COUNT I, TEN YEARS FOR COUNT II, AND TEN YEARS EACH FOR COUNTS III-V; WITH THE SENTENCES IN COUNTS I AND II TO RUN CONSECUTIVELY TO EACH OTHER BUT CONCURRENTLY WITH THE SENTENCES IN COUNTS III-V, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | REVERSED AND RENDERED - 05/19/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BARNES, J., FOR THE COURT:**

¶1.     On December 19, 2011, Philadelphia, Mississippi Police Chief Richard Sistrunk was provided information concerning a possible identify theft.  Upon further investigation, an informant, John Paul Dove, implicated Stanley Chesney (Chesney); so Chief Sistrunk obtained a search warrant from Municipal Judge Steven Cumberland for the residence of "Billy Chesney, Stanley Chesney and persons unknown" to recover "one computer with information on Sherri Stewart on identity theft."

¶2.     Upon arriving at the Chesneys' residence, Chief Sistrunk was informed by Chesney that his laptop computer was at a nearby computer repair store.[1]  The "Return" portion of the search warrant, listing what items were taken pursuant to the warrant, acknowledged:  "Mr. Chesney directed us to Gator Computers in the city to retrieve his computer."  When the police went to execute the search warrant and recover the computer at Gator Computers, the clerk at the store, Matthew Kaulfers, alerted them to the presence of certain photographs in the computer's "recycle bin" that he suspected depicted children performing sexual acts.[2] Kaulfers later claimed at trial that Chesney had dropped off the computer earlier that day and told Kaulfers he thought he was being investigated and the files in his recycle bin needed to be deleted.  However, upon cross-examination, Kaulfers admitted that he could not actually remember when Chesney made those statements and that this information was not contained

---

[1] Chief Sistrunk later stated during a motion-to-suppress hearing that Chesney also made a vague comment about "going to jail for some pictures," but it does not appear that those comments caused law enforcement any concern at that time, and this testimony was not given in the presence of the jury.

[2] The clerk later explained at trial that although he had not actually looked at the photos, the picture titles were sexually explicit in nature and indicated that minors were involved.

in his statement to police.

¶3.     Chesney's computer was taken to the police department, and Chris Stokes, who worked on computers for the Philadelphia police, was asked to do a search of the computer. He quickly located photographs that possibly depicted child pornography. Stokes was then advised to stop the search, and Chief Sistrunk began the process of obtaining a second search warrant for those files, with the assistance of the Mississippi Attorney General's cybercrime division. In the "Statement of Underlying Facts and Circumstances" to support the second warrant, Chief Sistrunk stated that Stokes had alerted him to "what could possibl[y] be photos of underage boys in the nude." The statement made no mention of Kaulfers or his comments. Chief Sistrunk signed the affidavit, and Judge Cumberland signed the second search warrant.

¶4.     Pursuant to the second warrant, Deputy Commander Jay Houston of the cybercrime division searched Chesney's computer and found five images depicting child pornography in the computer's recycle bin. Chesney was brought in for questioning and subsequently confessed to possessing the photographic files, claiming that he had found the files on a disk at a relative's house and admitted that he knew that child pornography was illegal.[3]

¶5.     Chesney was indicted on five counts of exploitation of a child.[4] At trial, defense counsel moved to suppress the evidence because the first search warrant for identity theft was

_____

[3] Chesney insinuated in his statement to police that he had been sexually abused as a child and that he looked at the pictures to see if they depicted what had happened to him. He also claimed he had not viewed any child pornography in months.

[4] *See* Miss. Code Ann. § 97-5-33(5) (Rev. 2014).

not based on credible or reliable information. A suppression hearing was conducted to determine whether probable cause existed to support the issuance of the first warrant. After the testimony, the circuit judge denied Chesney's motion, and the trial resumed. The circuit court also denied defense counsel's motion to have Chesney's statement to police "suppressed as being involuntary due to the fact that the statements were not recorded."

¶6. Chesney was convicted on all counts by a Neshoba County Circuit Court jury and sentenced to forty years in the custody of the Mississippi Department of Corrections (MDOC). He received thirty years for Count I, and ten years for Count II, which was to run consecutively to the sentence in Count I. For Counts III-V, Chesney was sentenced to ten years for each count, with the sentences to run concurrently with the sentences in Counts I and II.

¶7. Chesney filed a motion for a judgment notwithstanding the verdict or, alternatively, for a new trial. The circuit court denied his motion, and he now appeals. We find that Chesney's first claim, regarding the failure to instruct the jury on the element of venue, warrants a reversal of the judgment and a remand for a new trial.

¶8. We further conclude that Chesney's second claim of error – that the circuit court erred in denying his motion to suppress evidence "because probable cause did not exist for the issuance of the first search warrant" – is also meritorious. Chesney contends that all of the evidence implicating him in the instant crimes was obtained derivatively as a result of the first warrant. Thus, Chesney claims that the evidence is "fruit of the poisonous tree," and "the appropriate remedy is to reverse and render his convictions and sentences." We agree

4

with Chesney that the suppression of the "tainted" evidence would remove any legally sufficient basis to support his convictions.  Therefore, we reverse and render the circuit court's judgment.

## DISCUSSION

I.      **Whether the circuit court erred in failing to instruct the jury on the essential elements of the crime.**

¶9.      Chesney contends that the circuit court committed fundamental plain error by failing to instruct the jury on the essential elements of the crime.  Specifically, Chesney claims that the instruction failed to instruct the jury on the essential element of venue.  Jury Instruction S-1 stated identically as to each of the five counts:

> The Court instructs the Jury that if you believe from the evidence in this case beyond a reasonable doubt that at the time and place charged in the Count [_] of the indictment and testified about, that the Defendant, Stanley R. Chesney, did willfully, unlawfully and feloniously have in his possession a visual depiction of an actual child engaging in sexually explicit conduct, then it is your duty to find the defendant guilty as charged in Count [_].

¶10.     Although the State argues this issue is procedurally barred due to Chesney's failure to object to the instruction, the Mississippi Supreme Court has stated that "instructing the jury on every element of the charged crime is so basic to our system of justice that it should be enforced by reversal in every case where inadequate instructions are given, regardless of a failure to object at trial."  *Boyd v. State*, 47 So. 3d 121, 127 (¶22) (Miss. 2010) (quoting *Shaffer v. State,* 740 So. 2d 273, 282 (¶31) (Miss. 1998)).  "[T]he failure to submit to the jury the essential elements of a crime amounts to plain error."  *Pollard v. State*, 932 So. 2d 82, 87 (¶11) (Miss. Ct. App. 2006) (citation omitted).  "Venue is an indispensable element of any

5

criminal prosecution." *Hawkins v. State*, 90 So. 3d 116, 119 (¶6) (Miss. Ct. App. 2012) (citing *Smith v. State,* 646 So. 2d 538, 541 (Miss. 1994)). Accordingly, we find this issue is not barred from consideration.

¶11. In *Rogers v. State*, 95 So. 3d 623, 632 (¶30) (Miss. 2012), the Mississippi Supreme Court reversed a conviction and remanded for a new trial because the jury was not instructed "that it had to find from the evidence and beyond a reasonable doubt that the crime had occurred in Scott County, Mississippi." Rather, the jury instruction provided that the jury had to find that the defendant committed the offense "at the time and place charged in Count Two of the indictment and testified about[.]" *Id*. at 631-32 (¶28). The supreme court concluded: "Given that venue is 'essential' to a criminal prosecution, and that venue may be raised for the first time on appeal, we find that such an obvious omission is fatal and requires reversal." *Id*. at 632 (¶30) (internal citation omitted).

¶12. We find the record supports Chesney's claim. Like *Rogers*, the written jury instructions in the present case provided that the jury had to find the crime occurred "at the time and place charged" in each count. Also, the indictment was not submitted to the jury for consideration, "and the 'time and place testified about' was far from definite." *Id*. at (¶28). Moreover, when reading the instructions to the jury, the circuit court did not include the portion of the written instruction quoted above; thus, nowhere was the jury instructed in open court that the location of the conduct was an element of the offense. While there was some proof of venue elicited during the trial,[5] the jury was never instructed that it had to find

---

[5] "Proof of venue, as any other element of an offense, must be made beyond a reasonable doubt." *Campbell v. State*, 858 So. 2d 177, 179 (¶8) (Miss. Ct. App. 2003)

that the crimes occurred in Neshoba County. Accordingly, this issue warrants a reversal of the judgment and a remand for a new trial.

### II. Whether the circuit court erred in denying Chesney's motion to suppress the evidence obtained through the search warrant.

¶13. At trial, defense counsel "move[d] to suppress all evidence gained and acquired as a result of [the first] search warrant." Counsel argued that the affidavit and statement of facts by Chief Sistrunk, which had been provided to Judge Cumberland in order to obtain the original search warrant, failed to establish the informant's reliability; thus, there were no grounds for a valid search warrant. The circuit court overruled Chesney's motion to suppress the evidence.

¶14. On appeal, Chesney reasserts that "probable cause did not exist for the issuance of the first search warrant"; therefore, "all evidence implicating [him] for the instant offenses was obtained derivatively as a result of this illegal warrant [and] must be suppressed as fruit of the poisonous tree." He, therefore, contends that he "is entitled to have this Court reverse and render his convictions and sentences." The State counters that there was sufficient "credible information" to justify the issuance of the first warrant.

¶15. A "mixed standard of review" is employed when considering the circuit court's denial of a motion to suppress. *Gillett v. State*, 56 So. 3d 469, 482 (¶21) (Miss. 2010) (citing *Dies v. State*, 926 So. 2d 910, 917 (¶20) (Miss. 2006)).

Determinations of reasonable suspicion and probable cause are reviewed de

(citing *State v. Fabian,* 263 So. 2d 773, 776 (Miss. 1972)). Kaulfers testified that the store where he worked was located in Neshoba County, Mississippi, and that the computer was brought to this location.

7

novo. However, this Court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers. Thus, this Court is restricted to a de novo review of the trial judge's findings using the applicable substantial evidence/clearly erroneous standard. Finally, this Court reviews the admission or exclusion of evidence for abuse of discretion.

*Id*. (internal citations and quotation marks omitted).

### A.      Probable Cause

¶16.    Our supreme court has held that a court "may issue a [search] warrant based only upon probable cause, which is determined from the totality of the circumstances." *Batiste v. State*, 121 So. 3d 808, 859 (¶129) (Miss. 2013) (citing *Hughes v. State,* 90 So. 3d 613, 628 (¶43) (Miss. 2012)).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* (quoting *Lee v. State,* 435 So. 2d 674, 676 (Miss. 1983)) (internal quotation marks omitted). "[P]robable cause [for a search warrant] exists when the facts and circumstances within an officer's knowledge are 'sufficient to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.'" *Roach v. State*, 7 So. 3d 911, 917 (¶11) (Miss. 2009) (quoting *State v. Woods,* 866 So. 2d 422, 426 (¶11) (Miss. 2003)).

¶17.    In the present case, Chief Sistrunk's affidavit for the search warrant contained the following "Underlying Facts and Circumstances":

> On 08-23-11[,] Mrs. Stewart came to the [police department] to file a

complaint on identity theft. Mrs. Stewart stated that someone had stole[n] a picture of her off her Facebook page and created another Facebook on her. This person has since defrauded, slander[ed], used her identity in such a way[,] which became harmful to the job . . . which Mrs. Stewart held. I sent Facebook a subpeona and received back information on a[n] Amanda Warren. *I have since received information from John Paul Dove from Meridian[,] M[ississippi,] stating that it was in fact a Stan Chesney who was using the name of Sherri Stewart. Mr. Dove stated it started back in 2010 with different users and then Sherri Stewart's name with the same messages and pattern as before.*

(Emphasis added). The affidavit never described the information from Dove as being reliable or credible, despite the form's requirement that it do so.[6]

¶18. A confidential informant's veracity may be demonstrated through "a statement of the affiant that the confidential informant has given credible information in the past." *Peden v. State*, 132 So. 3d 631, 636 (¶16) (Miss. Ct. App. 2014) (quoting *Cooper v. State,* 93 So. 3d 898, 901 (¶8) (Miss. Ct. App. 2012)). At the hearing on the motion to suppress, Chief Sistrunk admitted to defense counsel that he had never met or spoken with the informant, Dove, prior to this incident.

> Q.  You have not spoken with Mr. Dove on the phone numerous times about other criminal cases that he's provided information for?
>
> A.  No, sir. *I don't even know this gentleman*.
>
> Q.  And he just spontaneously called you?
>
> A.  No. If I may, Ms. Stewart provided me with Mr. John Paul Dove's name. And once I talked with Mr. Dove, he advised me how he came into contact and knew Mr. Chesney and how we arrived to the

---

[6] The affidavit for the warrant directed the applicant that "[i]nformation obtained from informants must be described as reliable and the informants identified as credible persons. . . . [T]here must be shown enough of the underlying facts and circumstances from which the affiants conclude that the informants are credible and the information reliable."

9

information that was provided in the affidavit.

Q.    And you spoke with him on the phone one time[?]

A.    Actually[,] *I spoke with him on the phone twice, not numerous.*

. . . .

Q.    And you talked with him a total of two times on the phone[?]

A.    Tried to get him on the – first conversation, I wanted him to come to my office where I could speak with him, and he couldn't.  The second time over the telephone is when he provided the information how he came to know Mr. Chesney and the information given that I provided in the affidavit.

. . . .

Q.    And *he has never* – before your incident with Stanley Chesney, he has not *provided information about any other criminal activities*, has he?

A.    *Not that I'm aware of, no, sir.*

(Emphasis added).[7]   Judge Cumberland, who issued the search warrant, testified that he believed Chief Sistrunk had presented sufficient probable cause.

¶19.   The supreme court considered a similar situation in *Woods*, 866 So. 2d at 425 (¶7), 428 (¶21), where it upheld a circuit court's dismissal of charges against Steve Woods due to a "constitutionally defective" search warrant.  The circuit judge in *Woods* had granted the defendant's motion to suppress the evidence obtained through the search warrant, concluding:

That a search warrant was issued for the purpose of searching the defendant's residence on November 21, 2000.  That this search warrant was issued *solely based upon two telephonic conversations a metro narcotics agent had with a*

---

[7] Dove did not testify at the hearing.

10

> *confidential informant who had never previously supplied any information to any law enforcement agencies*. That the agent *failed to conduct an in person interview with the informant*, or to otherwise make attempts to test her veracity or credibility other than conducting an NCC background check. Further, *the agent failed to corroborate any of the information supplied by the informant through any independent investigatory means*. For these reasons, the Court finds that, based upon the totality of the circumstances, the application for, and issuance of, the instant search warrant is constitutionally defective and that the warrant and the fruits thereof are suppressed and held for naught.

*Id*. at 425 (¶7) (emphasis added).

¶20. This Court later addressed this issue in *Roebuck v. State*, 915 So. 2d 1132 (Miss. Ct. App. 2005). As in *Woods* and the present case, the defendant in *Roebuck* moved to suppress evidence obtained through the search warrant, arguing "that the underlying facts and circumstances portion of [the narcotics agent]'s affidavit did not contain a statement of reliability or a statement that the particular confidential informant had furnished reliable information in the past or was known to be reliable." *Id*. at 1136 (¶9). The affidavit only stated that the informant told the agent that Adam Roebuck was manufacturing methamphetamine at a residence. It was also noted there had been complaints about the residence from other sources. Like the present case, the circuit court denied the defendant's motion to suppress evidence. Upon review, this Court concluded in *Roebuck* that the narcotic agents had failed to provide the "issuing judge with some indicia of veracity or reliability supporting the confidential informant's allegation[.]" *Id*. at 1140 (¶24). During the suppression hearing, the narcotics agent "did not mention that his confidential informant was credible or believable or that the informant had provided credible information in the past in the affidavit or the underlying facts and circumstances" to the issuing judge. *Id*. at 1138

11

(¶18). "[S]imply repeating an informant's allegation, without more, does not overcome the threshold requirements for probable cause." *Id*. at 1137 (¶14). Accordingly, we reversed and rendered the judgment in *Roebuck* since, without the illegally obtained evidence, there was insufficient evidence to support the conviction. *Id*. at 1141 (¶28).

¶21. Based on the holdings in *Woods* and *Roebuck,* we find that the threshold requirements for probable cause, to support the issuance of the original search warrant, were not met. Chief Sistrunk admitted that he had only spoken with Dove a couple of times and that he had never met him. There was nothing in the affidavit, its underlying facts and circumstances, or the testimony to establish that the information provided by the informant was credible or reliable; nor was there any testimony that Chief Sistrunk attempted to corroborate Dove's statement through an additional independent investigation. The State's only response to this issue is that Dove was not the sole source of information, noting that Sherri Stewart was the initial source. However, we find this insufficient to establish probable cause. Stewart merely filed a complaint with police that an unknown person had stolen her identity to establish a Facebook account. Chief Sistrunk testified that Stewart "didn't have a clue who took her identity[.]" Therefore, Stewart's information did not establish probable cause for a search warrant for Chesney's computer.[8] It is clear from the statement of facts submitted to support the affidavit that Chief Sistrunk was solely relying on Dove's information.

### B. Fourth Amendment and the "Fruit of the Poisonous Tree"/Exclusionary-Rule Doctrine

---

[8] There is nothing in the record to indicate whether there was any evidence Chesney was responsible for the identity theft, the original cause for the search warrant.

¶22. Our inquiry does not end here, however. Finding that the first search warrant was invalid for lack of probable cause, we must now determine whether the resulting evidence obtained through the first warrant – including evidence obtained through the second search warrant and Chesney's confession – should have been suppressed.

¶23. The right to be free from unreasonable search and seizure is secured by the Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution. Under the "fruit of the poisonous tree" doctrine, "tangible evidence obtained incident to an unlawful search or seizure" is considered to be inadmissible. *Mosley v. State*, 89 So. 3d 41, 45 (¶13) (Miss. Ct. App. 2011) (citing *Marshall v. State*, 584 So. 2d 437, 438 (Miss. 1991)).

¶24. The United States Supreme Court discussed this exclusionary rule in *Wong Sun v. United States*, 371 U.S. 471, 484 (1963), stating that "evidence seized during an unlawful search could not constitute proof against the victim of the search." (Citation omitted). The *Wong Sun* Court specifically noted that in addition to "physical, tangible materials obtained either during or as a direct result of an unlawful invasion[,] . . . the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of papers and effects." *Id*. at 485 (citation omitted).

> [T]estimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion.

*Id*. (internal citations omitted). These policies underlying the exclusionary rule do not "invite

13

any logical distinction between physical and verbal evidence" and "the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction." *Id*. at 486.

¶25. The exclusionary rule discussed in *Wong Sun* has also been extended to evidence obtained through the issuance of a second valid search warrant. In *United States v. Clark*, 531 F.2d 928, 932-33 (8th Cir. 1976), the United States Court of Appeals for the Eighth Circuit affirmed a district court's ruling to suppress evidence obtained through a second valid search warrant, because it was "tainted" by an impermissible exploratory search of the defendant's premises, which was ruled outside the scope of the valid first search warrant. The United States District Court for the District of New Mexico similarly suppressed evidence obtained through a second search warrant, finding it was a result of the "exploitation" of a document that had been illegally seized. *United States v. Wick*, 52 F. Supp. 2d 1310, 1327-28 (D. N.M. 1999).

¶26. Further, in *State v. Dalpiaz*, 783 N.E.2d 976, 985 (¶38) (Ohio Ct. App. 2002), the Ohio Court of Appeals held: "Evidence seized during an unlawful search cannot constitute proof against the victim of the search; therefore, if the first search was unlawful, the evidence seized in the course of that search could not be used to support the issuance of the second search warrant." *See also State v. Jacob*, 924 N.E.2d 410, 417-18 (¶¶31-32) (Ohio Ct. App. 2009) (holding that evidence obtained pursuant to a second search warrant, which "was uncovered as a result of the earlier unlawful search," must be suppressed as "fruit of the poisonous tree"). In this case, Chesney's computer was initially seized pursuant to the first

14

search warrant, and the photographic evidence supporting Chesney's convictions was viewed pursuant to the second search warrant.

### i. Standing and Reasonable Expectation of Privacy

¶27. We find it important to discuss an issue that was not raised by either party in their initial briefs – whether Chesney had standing to challenge the search and seizure of his computer files by police. *See State v. Hicks*, 806 So. 2d 261, 263 (¶6) (Miss. 2002) (holding that an appellate court "may sua sponte address the question of standing") (citation omitted). We requested additional briefing by the parties as to whether Chesney had standing to assert a Fourth Amendment violation and had a reasonable expectation of privacy in the files and images on his computer after he had authorized a third party, Kaulfers, to work on his computer's operating system.

¶28. "Only those persons whose privacy is invaded by a search have standing to object to it under the exclusionary rule[.]" *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973).

> In order to qualify as a "person aggrieved by an unlawful search and seizure[,]" one must have been a victim of a search or seizure, *one against whom the search was directed*, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure *directed at someone else*.

*Id*. (emphasis added) (citation omitted). "We determine the issue of standing after a two-part inquiry: (1) whether the defendant had a subjective expectation of privacy in the place searched; and (2) whether, from society's perspective, that expectation was reasonable. *Bankston v. State*, 4 So. 3d 377, 380 (¶13) (Miss. Ct. App. 2008) (citing *Powell v. State,* 824 So. 2d 661, 663 (¶10) (Miss. Ct. App. 2002)).

¶29.    The State argues that once Chesney gave his computer to Kaulfers for repair, and Kaulfers's private search revealed the questionable file names, Chesney's reasonable expectation of privacy was frustrated by the private search.  The Supreme Court has noted: *"Once frustration of the original expectation of privacy occurs*, the Fourth Amendment does not prohibit governmental use of the now-*nonprivate* information[.]"  *United States v. Jacobsen*, 466 U.S. 109, 117 (1984) (emphasis added). This implies that standing to bring a Fourth Amendment claim is lost *once that information is made public by the private party*.

¶30.    We agree that if the search and seizure of Chesney's computer had occurred as a direct result of Kaulfers's private search and subsequent notification of police, there would be no Fourth Amendment violation as Chesney's reasonable expectation of privacy would be frustrated by his direction to Kaulfers to repair his computer and delete the files in question.  However, those are not the facts before us.  The police issued (what we have determined to be) an invalid search warrant, directing law enforcement to seize Chesney's personal computer from his home in order to look for evidence of identity theft.  The police obtained the computer from the repair shop only under the purported authority of the invalid search warrant.[9]  Therefore, if we disregard the comment made by Kaulfers to police regarding the file names on Chesney's computer, law enforcement still intended to seize the computer from the repair shop to look for evidence of identity theft.  Consequently, the illicit photographs

---

    [9] Although Chesney directed law enforcement to Gator Computers, we do not find that constitutes consent to a warrantless search.  *See United States v. Barth*, 26 F. Supp. 2d 929, 940 (Tex. Dist. Ct. 1998) (finding that an owner's consent to warrantless search was not voluntary, as he was told a search warrant had been issued, leading to the conclusion that withholding consent was meaningless).

16

were not obtained by the police as a direct result of Kaulfers's private search. Chesney argues that addressing this issue is unnecessary "because police obtained evidence by physically intruding on Chesney's constitutionally-protected area[.]" In this instance, we have to agree. Chesney was clearly the person against whom the government's search and siezure was "directed." *See Colbert*, 474 F.2d at 176.

¶31. Furthermore, even if we were to agree with the State that Kaulfers's private search frustrated Chesney's reasonable expectation of privacy in the computer's contents, we find the police's subsequent search of Chesney's computer was a Fourth Amendment violation, as it exceeded the scope of Kaulfers's private search. As the Supreme Court noted in *Jacobsen*:

> The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated. In such a case the authorities have not relied on what is in effect a private search, and therefore presumptively violate the Fourth Amendment if they act without a warrant.

*Jacobsen*, 466 U.S. at 117-18.

¶32. In *Walter v. United States*, 447 U.S. 649, 651-52 (1980), private parties opened a package received in the mail and discovered 871 boxes of film. The private parties attempted unsuccessfully to view the film by holding it up to the light. As there were suggestive drawings and explicit descriptions of the contents on the outside of the boxes, the private parties contacted law enforcement. Without obtaining a warrant, agents from the Federal Bureau of Investigations (FBI) viewed the film, using a projector. The Supreme Court held that the viewing of the film by the FBI was unconstitutional, because the private parties had

17

not viewed the film. "The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection. Since the additional search conducted by the FBI – the screening of the films – was not supported by any justification, it violated that Amendment." *Id*. at 659 (footnotes omitted).[10]

¶33. In a factually similar case, *Barth*, 26 F. Supp. 2d at 937, the Texas district court concluded that law enforcement's viewing of additional computer images (that contained child pornography), which had not been viewed in the private search conducted by the computer technician, implicated the defendant's Fourth Amendment rights, as a subsequent

---

[10] In contrast, the Supreme Court in *Jacobsen* held that "it hardly infringed respondents' privacy" for law enforcement agents to reexamine the contents of a package unsealed and opened by Federal Express employees. *Jacobsen*, 466 U.S. at 119. Law enforcement merely brushed aside a crumpled newspaper and picked up the tube, which the private parties had unsealed. *Id*. The Court explained:

> Respondents could have no privacy interest in the contents of the package, since it remained unsealed and since the Federal Express employees had just examined the package and had, of their own accord, invited the federal agent to their offices for the express purpose of viewing its contents. The [law enforcement] agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment.

*Id*. Noting the relevancy of the fact that the "respondents' privacy interest in the contents of the package had been largely compromised," the *Jacobsen* Court held: "Under these circumstances, the package could no longer support any expectation of privacy[.]" *Id*. at 121.

However, in the present case, Kaulfers did not view the contents of Chesney's files; so the files were not "freely available" for inspection by the police. Furthermore, Kaulfers did not "invite" police to the computer store to view the contents of Chesney's computer. They were there under the purported authority of the invalid warrant.

18

police search must be "limited in scope to the private party's search." *Id*.

¶34. Kaulfers testified that he only looked at the file names in the recycle bin. Law enforcement admitted that Stokes, the technician employed by police, viewed the actual files/photographs before the police obtained the second search warrant. Therefore, based on the holdings in *Walter* and *Barth*, we find that the search of the computer files by the police prior to obtaining the second search warrant was a violation of Chesney's Fourth Amendment rights.

¶35. Accordingly, under the specific facts of this case, we find that Chesney had standing to challenge the search and seizure of his computer under the Fourth Amendment and that he had a reasonable expectation of privacy in its contents.

### ii. Independent-Source Doctrine

¶36. In *Murray v. United States*, 487 U.S. 533, 536-37 (1988), the Supreme Court expounded on the exclusionary rule, stating:

> [T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, *up to the point at which the connection with the unlawful search becomes "so atten*[]*uated as to dissipate the taint*[.]"

(Emphasis added) (quoting *Nardone v. United States,* 308 U.S. 338, 341 (1939)). *Murray* involved whether evidence of marijuana found in a warehouse, which was obtained through a valid search warrant based on an illegal warrantless search, should have been suppressed. *Id*. at 535. As the agents already had the warehouse under surveillance prior to their warrantless entry and strongly suspected drugs were located on the premises, the *Murray*

19

Court vacated the district court's denial of the defendant's motion to suppress and remanded "for determination [of] whether the warrant-authorized search of the warehouse was an *independent source* of the challenged evidence," as the district court did not "explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse." *Id*. at 543-44 (emphasis added).

¶37.    Thus, there are instances where evidence seized through a second search warrant, that was based on an invalid initial warrant or illegal search, has been ruled admissible. In *State v. Dasen*, 155 P.3d 1282, 1285-86 (¶¶14-18) (Mont. 2007), the Montana Supreme Court held that evidence returned to a defendant due to an invalid search warrant, but which was subsequently reseized through a second search warrant, was admissible, concluding:

> [T]he information provided to secure the second warrant was information the State obtained *prior to the first search warrant*, as well as *information obtained from additional sources not connected to or derived from the first search*. The State submitted the same information used to secure the first search warrant, *which was obviously obtained without the information gained in the first search*. Further, the few new pieces of information submitted were independently obtained as well, such as details provided by one of the victim's grandmother[s], and information concerning a wire transfer known to the State *prior to the first search*. Finally, while the first search was a factor in obtaining the second search warrant, in that the invalidity of the first search necessitated a second warrant, *the State nevertheless possessed sufficient independent information to "purge the taint" of the first search*.

*Id*. at 1286 (¶21) (emphasis added); *see also McKinney v. State*, 582 S.E.2d 463, 465 (Ga. Ct. App. 2003) (citation omitted) (Because evidence seized as a result of a second search warrant was not "obtained by exploitation of the original defective search warrant," it was "separate and distinguishable . . . so as to be 'purged of the primary taint.'"); *State v. Zesiger*, 65 P.3d 314, 318 (¶14) (Utah Ct. App. 2003) (finding that "[a]ny taint on the evidence from

20

the first illegal search was cured by the fact that the State *did not use any information gained from the illegal search* in its affidavit for the second search warrant" (emphasis added)).

¶38. Although the State did not initially challenge Chesney's argument that all of the evidence was derivative of the first search warrant, this Court also requested additional briefing on the issue of whether Kaulfers's statement to police – that he had located files that appeared to be child pornography – could constitute "independent probable cause to support the temporary seizure of the computer for the purpose of obtaining a search warrant for the alleged images." In his response, Chesney claims Kaulfers's comments were insufficient to justify the seizure of his computer. The State, however, argues that Kaulfers's statements "would give a 'man of reasonable caution a belief that there was a practical, non-technical probability that five images of child pornography were present on' Chesney's computer." (Quoting *United States v. Gereb*, 547 F. Supp. 2d 658, 662 (W.D. Tex. 2008)).

¶39. Unlike *Dasen*, *McKinney*, and *Zesiger*, we find there was no independent source of information for the second search warrant in the present case. Chief Sistrunk's statement attached to the application for the second warrant said that the computer files were found by Stokes, the computer technician for the police. Therefore, the second warrant, and resulting search of the computer, was expressly related to the evidence secured through the execution of the first warrant. Further, even if Chief Sistrunk's statement had referenced the statement by Kaulfers, which it did not, we note that there is nothing to indicate Kaulfers would have independently come forward with the information regarding the photographs. In fact, Chief Sistrunk testified that Kaulfers made a brief comment regarding the possible content of the

21

pictures and, when questioned further, "he didn't want to say a whole lot[.]"[11] Consequently, we find nothing to "purge the taint" of the invalid first search warrant from the second warrant.

### iii. Good-Faith Exception and Inevitable-Discovery Doctrine

¶40. We also find that this case does not fall under the well-recognized exceptions to the exclusionary rule: the good-faith exception and the inevitable-discovery doctrine. Under the good-faith exception, the State may admit "evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid." *Magee v. State*, 73 So. 3d 1183, 1189 (¶21) (Miss. Ct. App. 2011) (citing *United States v. Leon,* 468 U.S. 897, 918-21 (1984)). However, the good-faith exception does not apply in instances where "*the* [*search*] *warrant is based on an affidavit so lacking in indicia of probable cause that official belief in its existence is entirely unreasonable*[.]" *Id*. at (¶22) (emphasis added). Here, we find any reliance by the police on the underlying facts to support probable cause for the first warrant was "entirely unreasonable." Chief Sistrunk obtained and executed the original search warrant based on Dove's accusations, even though Chief Sistrunk later acknowledged he had never met Dove and Dove had never provided any information to law enforcement prior to this event. A similar situation was addressed in *Dalpiaz*, 783 N.E.2d at 987-88 (¶49), with the appellate court concluding:

[T]he inquiry is not simply whether the officers thought they were doing the

---

[11] An arrest warrant issued for Kaulfers a day before the trial commenced for failure to appear, which is contained in the record, is another indication he was reluctant to be involved.

right thing, but whether a reasonably well-trained officer would have known that the search was illegal. . . . [A] brief perusal of the affidavit would suffice for an officer to realize that the issue of the informants' reliability had not been addressed. Just as a brief perusal of the boilerplate language contained in the same affidavit indicates that such a statement of informant reliability is a necessity.

More recently, in an unpublished opinion, the Montana United States District Court noted: "Reasonably well-trained officers would have known of the need to corroborate a vague, anonymous, second-hand tip. . . . Suppression here is warranted to further the goal of deterrence of future unlawful police conduct, and to effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Embry*, No. CR-14-21-BLG-SPW-CSO, 2014 WL 1809388, at *13 (D. Mont. May 7, 2014). Additionally, as the original search, which resulted in the seizure of Chesney's computer, was unlawful, the good-faith exception also would not apply to the second search warrant.

¶41. The State alternatively argues in its supplemental brief that "this Court may rely on the inevitable-discovery doctrine[.]" The inevitable-discovery doctrine states that "results of an unreasonable search will be admissible if it can be shown that this evidence would have ultimately been discovered by constitutionally permissible means." *Pugh v. State*, 101 So. 3d 682, 689 (¶29) (Miss. Ct. App. 2012) (citing *Nix v. Williams,* 467 U.S. 431, 444 (1984)). The State argues that "Kaulfers'[s] disclosures to Chief Sistrunk inside Gator Computers support the reasonable probability that Chesney's computer and the child pornography stored on its hard drive would have been lawfully discovered." However, as we have already discussed in the preceding issue, there was no evidence that Kaulfers would have independently contacted and informed the police of the computer files, without the alleged

23

authority of the first search warrant. Thus, we find nothing to indicate the child pornography on Chesney's computer would inevitably have been discovered through constitutionally permissible means.

### iv. Inadmissibility of Evidence Obtained Through Both Search Warrants

¶42.    Consequently, the evidence obtained as a result of the improper search warrants and unlawful search – including the evidence of Chesney's telling police where his computer was located, the verbal evidence of the computer store employee's comments concerning the pictures on Chesney's laptop, and the five photographs obtained through the second search warrant – should have been excluded. As the Supreme Court stated in *Wong Sun*, evidence obtained through an illegal search, both physical and verbal, cannot "constitute proof against the victim of the search." *Wong Sun*, 371 U.S. at 484-85; *see also Clark*, 531 F.2d at 933 (affirming the suppression of evidence obtained in second valid warrant, as it was "tainted" by impermissible initial search); *Roebuck*, 915 So. 2d at 1141 (¶26) (reversing conviction as "fingerprint exemplars taken pursuant to the invalid search warrant provided the only means by which the State could connect [the defendant] to the methamphetamine lab . . . [and] evidence seized pursuant to the illegal search warrant must be suppressed as the fruit of the poisonous tree").

### v. Inadmissibility of Chesney's Confession

¶43.    We further find Chesney's statement to law enforcement should have been excluded.[12]

_____

[12] Chesney's counsel moved to suppress all evidence obtained as a result of the insufficient search warrant, and he additionally requested suppression of Chesney's statement because it was not recorded. Although defense counsel did not reassert the

24

At the suppression hearing, the circuit judge found Chesney's confession was voluntary. Chesney was given a *Miranda*[13] warning prior to questioning, and there was no evidence of duress during the interrogation, although Chief Sistrunk did acknowledge that Chesney appeared nervous. However, while his statement may have been voluntarily given, Chesney only confessed to possessing the child pornography when confronted by police with information about what had been discovered on his laptop. Chief Sistrunk testified: "Once the pictures were confirmed by Mr. Houston, I then went back to the office and advised Mr. Chesney of what we did find, at which time he then g[a]ve us an oral statement of how the[] pictures got there."

¶44.    In *Patterson v. State*, 413 So. 2d 1036, 1038 (Miss. 1982), our supreme court held:

> [A] confession obtained by confrontation of an accused with articles indicating the commission of a crime obtained as a result of an illegal search renders the contemporaneous confession inadmissible. Likewise, where the confession comes so closely in time subsequent to the confrontation that the lapse has not attenuated the taint of illegality, proof of the confession may not be given.[14]

In *State v. Young*, 974 So. 2d 601 (Fla. Dist. Ct. App. 2008), the appellate court considered a case involving circumstances similar to the present case. In *Young*, the defendant's computer, which contained evidence of child pornography, had been improperly seized from the defendant's private work office without his consent. *Id*. at 610. He was subsequently

---

inadmissibility of the confession based on a Fourth Amendment violation, we do not find this to be a waiver of this issue, as the circuit court had already ruled that the search warrants were supported by probable cause.

    [13]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

    [14] The *Patterson* court found the confession at issue to be admissible, as the statement was made prior to the illegal search. *Patterson*, 413 So. 2d at 1039.

interrogated by law enforcement, and he made "incriminating statements related to child pornography." *Id*. at 608. Law enforcement presented the defendant with a printout of websites he had visited, and he was aware during his interrogation that officers had been in his office. In affirming the trial court's grant of the motion to suppress, the district court stated that it could not conclude that the defendant's "willingness to give incriminating statements was unaffected by the illegal search" and that the state had failed to point "to any event or circumstance that broke the chain of illegality." *Id*. at 614; *see generally* Annot., *"Fruit of the Poisonous Tree" Doctrine Excluding Evidence Derived from Information Gained in Illegal Search*, 43 A.L.R. 3d 385 (1972 & Supp. 2014) (explaining that "fruits" doctrine applies to confession obtained via illegal search).

¶45. In this case, Chesney's statement was given contemporaneously with his being informed that child pornography had been discovered on his computer. There was no intervening event to attenuate the taint of the illegal search. As in *Young*, Chesney's statement to police should have been suppressed as evidence, as there was no event to break the "chain of illegality."

## CONCLUSION

¶46. We find that the circuit court should have granted Chesney's motion to suppress the evidence of the photographs and Chesney's statement to police, as they were both "fruit of the poisonous tree." As a result, there is no legally sufficient evidence to support Chesney's convictions. Without the evidence of the computer files/photographs and Chesney's

confession, there was no other basis for the charges.[15]  As we concluded in *Roebuck*:

> [F]inding the evidence against [the defendant] legally insufficient after suppression of the fruits of the illegal search warrant, this Court is not at liberty to reverse and remand for a new trial.  In such an instance, "[t]he prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble."  [*Burks v. United States*, 437 U.S. 1, 16 (1978)].  In *White v. State,* 735 So. 2d 221 (Miss. 1999), the Mississippi Supreme Court determined that when, as a result of the suppression of evidence obtained illegally, the evidence against the accused cannot sustain a conviction, the proper remedy is to reverse and render.  *See id.* at 224 (¶10).  Accordingly, we must do the same.

*Roebuck*, 915 So. 2d at 1141 (¶28); *see also Trejo v. State*, 76 So. 3d 702, 709 (¶14) (Miss. Ct. App. 2010) (finding that without the evidence of the cocaine obtained through an unlawful search, the evidence was insufficient to support the verdict and "[t]he proper remedy . . . is for the Court to reverse and render") (quoting *Readus v. State,* 997 So. 2d 941, 944 (¶13) (Miss. Ct. App. 2008)).

¶47.    Accordingly, we must reverse and render the circuit court's judgment.  While the nature of Chesney's crimes is abhorrent, the protection provided by the Fourth Amendment is not dependent on the nature of the criminal activity.  As the United States Court of Appeals for the Ninth Circuit has cautioned:  "Given the current environment of increasing government surveillance and the long memories of computers, we must not let the nature of the alleged crime, child pornography, skew our analysis or make us 'lax' in our duty to guard

_____

[15] Even if Chesney's confession were admissible, there would be no corroborating evidence to support a conviction.  *See Stephens v. State*, 911 So. 2d 424, 435 (¶34) (Miss. 2005) (citing *Hodge v. State,* 823 So. 2d 1162, 1166 (¶12) (Miss. 2002)) (A defendant's confession to a crime "is not sufficient to support a felony conviction unless it is corroborated by independent evidence of the corpus delicti.").  Although Kaulfers testified at trial about the questionable file names on Chesney's computer, he claimed never to have viewed the photographs; therefore, he could not testify as to their content.

27

the privacy protected by the Fourth Amendment." *United States v. Gourde*, 440 F.3d 1065, 1074 (9th Cir. 2006) (agreeing with the dissent's proposition, but finding no Fourth Amendment violations).

¶48. Based on our holding, Chesney's remaining issues are rendered moot.

¶49. **THE JUDGMENT OF THE NESHOBA COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO NESHOBA COUNTY.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, ROBERTS AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. MAXWELL, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

**CARLTON, J., DISSENTING:**

¶50. I would reverse and remand for a new trial due to error on the issue of venue. *See Rogers v. State*, 95 So. 3d 623, 632 (¶30) (Miss. 2012) (burden of proof rests upon the State to prove venue beyond a reasonable doubt to the jury, not the trial judge, and an omission from the instructions on this essential jury question requires reversal).

¶51. In this case, like in *Rogers*, the failure to instruct the jury so it could determine the essential element of venue was fatal and requires reversal. *Id.* at (¶¶30-31). This error is dispositive. Therefore, I submit that we must remand for a new trial and should exercise restraint by refraining from comment on the remaining assignments of error since we have no power to issue advisory opinions for the retrial of this case. *See Nelson v. State*, 72 So. 3d 1038, 1045 (¶22) (Miss. 2011).